**Affirmed as Modified and Memorandum Opinion filed June 11, 2019.**



In The

# Fourteenth Court of Appeals

## NO. 14-17-00460-CR

**TERRANCE DEVAUGHN EDWARDS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 177th District Court
Harris County, Texas
Trial Court Cause No. 1510607**

## M E M O R A N D U M   O P I N I O N

A jury found appellant Terrance Devaughn Edwards guilty of directing activities of criminal street gangs. *See* Tex. Penal Code § 71.023. The jury assessed appellant's punishment at fifty-five years. Appellant timely brought this appeal and raises five issues. For the reasons stated below, we modify the judgment and affirm the judgment as modified.

## BACKGROUND

From March to May of 2015, six aggravated robberies took place at various cellphone stores in the Houston area. The investigation into the robberies revealed a similar *modus operandi* and led investigators to believe the persons involved in robbing the stores were part of a criminal street gang. Further, investigators discovered the robbers were financed, directed, and/or supervised by identifiable leaders. The investigation culminated in the arrest and indictment of appellant for directing activities of a criminal street gang. Several accomplices testified at trial. The jury found appellant guilty as charged and assessed his punishment.

## SUFFICIENCY OF THE EVIDENCE

We initially consider appellant's fifth issue in which he claims the evidence is legally insufficient to support his conviction because, if sustained, that issue would afford the greatest relief. *See* Tex. R. App. P. 43.3; *Campbell v. State*, 125 S.W.3d 1, 4 n.1 (Tex. App.–Houston [14th Dist.] 2002, no pet.) (stating reviewing court should first address complaints that would afford the greatest relief). Because in appellant's third issue he contends the non-accomplice evidence was insufficiently corroborated by other evidence, we separate the testimony of the accomplices from that of the other witnesses in our discussion of the evidence adduced at trial.

### *The Evidence*

A.     Robbery of March 18, 2015

John Davis and two female associates were working at Cellular Sales, a Verizon cellphone store located at 9105 West Road, when two men entered. Davis and the sales associates were directed to put the phones from the safe — Apple iPhones and Samsung Galaxy phones — into three pillowcases. The men were aggressive, and both had guns. During the course of the robbery, one man pointed

his gun at the head of a sales associates who was kneeling on the floor and both men pointed their guns directly at Davis. Davis was afraid he would be shot and feared for his life. The men's faces were covered by bandanas from the nose down and the men were wearing hoods on top of their heads. Davis testified that he could tell both men were African-American but that he would not be able to positively identify them. Davis could not identify appellant in court.

It appeared to Davis the robbers had done this before. The robbers stated they did not want the phone with a GPS tracker[1] and rejected one with what appeared to be a "sticky note." Davis could not tell which phone had a tracker. As the men left, they told Davis and the sales associates to lay face down.

Approximately two or three minutes later a deputy sheriff arrived and was informed the suspects had fled. A Kroger employee told the deputy that she had seen two males, one carrying what appeared to be several bags, run to the Kroger loading dock, get into a car, and head north. A surveillance video at the loading dock showed a car that appeared to be an early to mid-2000 Nissan Altima.

The store manager, Bobby Penny, was notified of the robbery. A list of the inventory taken was compiled and the value of the phones stolen was $36,125.

At trial, surveillance video from inside the store was admitted into evidence.

B.      Robbery of April 3, 2015

Jose Pleitez was a sales manager for a Radio Shack located at 5185 West 34th Street on April 3, 2015, when the store was robbed. Pleitez was in the back of the store when he heard a commotion at the front, where his co-worker, Adrian Barone, was working. On the monitor, Pleitez saw people robbing the store. Pleitez activated

---

[1] The phone with the tracker blends in with the others, but when picked up activates and acts as a tracking device.

the alarm but did not close the safe for fear the robbers would hurt him or Barone if they heard the noise. Barone was brought to the back of the store with his head covered. Pleitez saw the robbers with at least two guns. The robbers wore masks and gloves but Pleitez could see portions of their arms and based upon the tone of their skin testified the robbers were African-American. They took Pleitez to the front and demanded all the cash from the register. Pleitez complied. The robbers returned to the back of the store with Pleitez and told him not to "hold back" on the merchandise. Pleitez was threatened and told not to include any tracking devices. The robbers went straight to the safe for the phones and to the register for the cash. After the robbers left, the police were called. Pleitez estimated the robbers took about $300 to $500 in cash from the register and approximately $20,000 to $30,000 in merchandise — mostly smart phones.

At trial, a video recording from the store's surveillance system was admitted into evidence.

C.    Robbery of April 15, 2015

Darrell Jerome Miles, a sales associate for a Verizon store on Wallisville Road, was at work when the store was robbed. Miles had been assisting two women in purchasing phones, and they began to leave the store. Miles was walking to the back when the women began running in that direction. Two African-American males wearing masks came into the store; Miles walked towards the register and lay on the ground. The women in the back tried to shut the door on one of the males chasing them and they began struggling with the door. Miles arose and began opening the register, when he was instructed to get down. Miles' co-worker was taken to the back of the store. The man struggling with the two women took their phones and slammed them onto the ground. Miles and his co-worker were instructed to get the cellphones. There were two safes from which cellphones were taken and placed in two black

4

bags. One of the safes also contained cash. At one point, a gun was put to Miles' head and he was told to hurry up. Miles' co-worker was told to "get the register" but the men decided against it and left. Miles said the men did not have time and were there for the phones.

Surveillance footage from the store was admitted into evidence during trial. The surveillance footage shows one man looking at his watch as if to gauge the time spent inside the store and Miles thought they worked as if they were on a time limit. It did not appear the men were talking on their own phones. Miles thought the men knew what they were doing and were experienced in committing this type of crime. He called 9-1-1 after the men left. The men took a large number of phones — predominantly iPhones and Samsung Galaxy phones — with a value of about $46,174. The getaway vehicle had been stolen and was recovered within two miles of the store. Three brown pillowcases were found inside.

Sergeant Ben Katrib with the Harris County Sheriff's Office was assigned to follow up on the investigation. The suspects had fled north toward a residential subdivision north of the store. Katrib recovered video from residential surveillance cameras which showed a silver Buick automobile with a man waiting inside. Two males, one of whom had a bag similar to the one on the store surveillance video, got into the Buick and proceeded north.

D.      Robbery of April 26, 2015

Brandon Nolen worked at an AT&T store at 2123 Crosby Freeway on April 26, 2015. The store did not have video surveillance. Two customers, Raymond Polka, Jr., and his sixteen-year old nephew, Dalton James Grosshart, were in the store. Two males and one female, all African-American, entered through the front door. Two of them had handguns and all three had black masks. Polka testified that both the female and the smaller male had guns, but he did not recall that the larger

male had a gun. Grosshart testified that two of the three had weapons. Nolen thought the guns had a shape and slide like a Glock. Polka saw one of the guns up close and it looked like a Glock. Polka testified that he is familiar with firearms and it was definitely that style. Grosshart also testified that one of the pistols looked like a Glock.

Nolen tried to run but a man pointed a gun at him and told him to stop or he would shoot. Nolen stopped, and was told not to move and to get on the ground. The gun was pushed into Nolen's back and he complied. The second person took control of Polka and Grosshart, who were ordered to lie on the ground. The third person locked the door.

Nolen, Polka and Grosshart were ordered to the back room and told to get down. Polka's and Grosshart's phones were broken when the larger man threw the phones to the ground and stomped on them. Nolen was given a bag and told to open the safe. The intruders rushed him, pressed the gun against his shoulder, and got louder and more aggressive. Their behavior escalated when Nolen had trouble opening the safe. They told Nolen to hurry and put everything in the bag. Nolen was shaking and scared. He started filling the bag before he "froze" and was told to lay on the ground. The robbers pointed their weapons at Grosshart and Polka but did not say they would shoot them. One of the men took the bag and began filling it.

The robbers took the majority of phones in the safe, including a tracker phone. Nolen testified that none of the suspects said anything to him about a tracker phone. At trial, Nolen testified he created an inventory list and most of the phones taken were iPhones and Samsung Galaxy phones, and that the robbers appeared to know what they were looking for and selected those model phones. Nolen recalled the robbers saying to get more money and hurry up but did not recall if they made him open the cash register or if took any cash. The robbers stopped unloading the safe,

6

told Nolen to put his head down and placed a gun to the back of his head. When Nolen looked up, the robbers were gone. Nolen called 9-1-1. Polka testified the robbery took less than five minutes, and stated, "They definitely had a plan in place and executed it." Neither Polka nor Nolen saw any of the three robbers talking on their phones.

There was a "Bloodhound" tracker in the stolen phones, which activated. A "bloodhound" is a GPS tracker designed to look like a normal cellphone; however, when it travels a certain distance from a designated location, it is activated, and the signal goes straight to dispatch. Based on the information provided by the tracker, a deputy identified a likely suspect vehicle and activated his vehicle's emergency lights. The suspect vehicle eventually stopped, and three people ran in a northerly direction into a patch of woods. The driver remained in the vehicle. When another unit arrived, the driver, identified as James Philpot, was taken into custody.

Firearms and ammunition were recovered from the stopped vehicle, specifically a black Glock .45 caliber pistol and magazine, a black Glock .40 caliber pistol and extended magazine, and a black Sig Sauer .45 caliber pistol and magazine. Two bags filled with cellphones and related items were found on the floorboard in the back of the vehicle. Cash also was found in the vehicle.

A search began for the three suspects who fled on foot. Black clothing and a pair of earbuds were found. After a search of the wooded area was discontinued, officers went to a church just north of the searched area. They were approached by a witness who had observed two African-American males run from the wooded area into the Kingman subdivision. The officers drove to the neighborhood and located two suspects. Both men were wet and muddy, indicating they had been inside the wooded area. They were detained and later identified as Deondrick Mitchner and Levonte Williams.

Jaimi Hawkins, the female suspect, was later arrested after an individual came forward with information. That individual provided cellphone video of Hawkins bragging about having committed the robbery.

Sergeant Katrib asked to be assigned to the April 26 robbery because he believed it might be related to the April 15 robbery, based upon the relative locations of the two stores and the similarities between the two robberies. Also, a hooded sweatshirt recovered in the wooded area after the April 26 robbery was similar to a sweatshirt worn by one of the suspects in the April 15 robbery. Katrib found it significant that in both the April 15 and April 26 robberies, suspects took a complainant's cellphone and smashed it to the ground.

Before interviewing any suspects, Katrib gathered information on a group of individuals committing aggravated robberies on the east side of Harris County, specific to that area. There were several names involved and the suspects were considered to be members of a gang, because they were individuals that had decided to work together to get money.

E.      Robbery of April 27, 2015

Anne Reston was working at a T-Mobile store located at 2500 Green Oak Drive in Kingwood, Texas, when two men entered with their faces covered by ripped-up T-shirts. They cocked their guns and said it was a robbery. The store was equipped with video surveillance. The shorter man told everyone what to do while the other man, who had been wearing iPhone earbuds, did not say much. Reston did not recall hearing him talk on a phone. Reston and her co-worker, Francisco, were told to go in the back of the store, where the phones and deposits were kept. Reston was told to open the safe but lied and said she was new and did not have access. Reston emptied the cash registers as she was directed. One of the men put phones into a T-Mobile bag from the store. A man tried to enter the store but saw Reston

8

emptying the registers with a gun right behind her. Reston believed he called the police. The robbers went out the front door and Reston pushed the panic button. Reston did not recall the exact value of the phones stolen but stated it was more than ten of the expensive ones, ranging from $700 to $1,000 each.

Houston Police Department Officer Gary Sanchez responded to the call. Sanchez was informed a citizen was following the suspect vehicle and shots had been fired at the citizen. The vehicles were coming towards Sanchez's location and when he began pursuit, the civilian backed off. The vehicle was described as a silver Nissan Altima, license plate FJS 8457. The vehicle made a U-turn and shots were fired in Sanchez's direction. Sanchez followed and notified dispatch that he was in pursuit, shots had been fired, and the three occupants in the vehicle appeared to be changing clothes. The vehicle came to a stop on the highway and three males exited the vehicle — one went northbound, one went southbound, and the remaining male entered the driver's seat and proceeded southbound. One of the men on foot was taken into custody at a gas station by Officer Travis Vaughn of the Humble Police Department. He was later identified as Dominic Rodriguez. The other man on foot was found in a Chili's restaurant and taken into custody by Officer Dwayne Pruitt, Jr., of the Houston Police Department. He was later identified as Randall Sullivan. A "hoodie-type" sweatshirt that could have been discarded by one of the suspects was found in some nearby bushes.

Detective Kenneth Edie of Houston Police Department was assigned to investigate. When Edie arrived at the T-Mobile store, the two suspects who had been apprehended had been taken back to the store. Edie identified the two suspects as Rodriguez and Sullivan. Edie testified Rodriguez's appearance that night was consistent with one of the suspects on the store's surveillance video and with

9

someone who had discarded a hoodie seen in the video. The suspects were charged with evading arrest.

Edie received information that Rodriguez and Sullivan were connected to suspects in other robberies that the Harris County Sheriff's Office was investigating. Detective Edie and Sergeant Katrib began a joint investigation. Katrib had audio recordings that tended to connect the April 27 robbery with the other cases. Edie reviewed the recordings and determined they were relevant to the various investigations.

Two days after the robbery, the getaway vehicle, identified by the license plate FJS 8457, was found abandoned. The back window on the passenger's side of the vehicle was broken out.

F.     Robbery of May 21, 2015

Jose Barrera was employed by Connectivity Source, a Sprint provider, on May 21, 2015, at a store located at 566 West FM 1960. The store was equipped with video surveillance. Two masked men ran into the store. The men took approximately forty phones from a safe. One of the men said not to put a tracker in the bag and threatened to come back if he found one. There was a tracking device in the safe and the other employee put a tracker in the bag. A man holding a gun commanded Barrera to take the money from the drawer. One of the weapons looked like a handgun; it was silver and black with an extended clip. Barrera and his co-workers stayed in the back room for several minutes after the men left. Someone called 9-1-1. A tracking device is mentioned in the call.

Matthew Garrett Major, Field Operations for Sprint Connectivity Source, was alerted that a GPS tracking device was moved. He called the store, but no one

answered. Major accessed the security cameras and realized a robbery was in progress. Major called the police department.

Deputy Terrence Bullard of the Harris County Sheriff's Office responded, and as he approached the scene he saw a light-colored Mercedes Benz exit a parking spot. There were two African-American males in the front seat. Video surveillance from a Chili's restaurant across the street from the Sprint store shows that the vehicle used as the getaway car arrived as the robbers were exiting the store and the gold Mercedes Benz followed the getaway vehicle. The video does not show appellant's face.

Using the tracker's location, the lead patrol car, with lights and sirens activated and other deputy patrols following, pursued the getaway vehicle, a Mercury Grand Marquis with temporary plates. During the chase, one of the officers was flagged down by two citizens regarding a firearm on the road. The firearm was taken into police possession. Eventually, the Mercury Grand Marquis turned into a subdivision, went down a dead-end street, and stopped. Two people immediately exited the vehicle and jumped over a fence. There was one person left in the vehicle. A deputy held him at gunpoint until another unit arrived and removed him from the vehicle. That man was identified as Antoine Duplechin-Holden.

Officers located the individuals who had fled on foot. The suspects were tracked by a police dog to a metal storage building at the back of a residence. The suspects were detained and eventually taken back to the store where they were both identified by Barrera. Those men were later determined to be George Randall and Christin Criswell.

G.	Geolocation Evidence

Following the robbery on May 21, 2015, Katrib interviewed George Randall, Antoine Duplechin-Holden, and Christin Criswell. Photographic lineups shown to the three suspects resulted in positive identifications of Quinton Malbrough[2] and appellant. Randall, Antoine, and Criswell consented to a search of their cellphones. On Randall's cellphone, the contact "Streetz" had phone number (\*\*\*) \*\*\*-0232.[3] Randall's log had a call from that number. Philpot's phone also had a contact for "Streetz" with the same number, (\*\*\*) \*\*\*-0232. Philpot, Antoine and Anthony Hill testified that appellant's nickname is "T-streetz." Mitchner testified appellant's nickname is "Streetz." The subscriber for that phone number is Yereka Lee and evidence was introduced that she and appellant had a child together. Katrib testified that he identified the voice on the receiving end of a phone call made to (\*\*\*) \*\*\*-0232 as appellant. Katrib then identified appellant in the courtroom.

Katrib testified the phone records showed who was communicating before, during, and after the robberies. The phone records demonstrated the approximate location of the cellphone at the time of the offense, where that cellphone traveled, and with which other cellphones — before, during, and after the robberies — there was communication. Katrib testified there was sufficient corroboration from the cellphone records to establish probable cause to arrest appellant. Warrants to arrest appellant and Malbrough were obtained.

---

[2] As noted below in the excerpt from the jury charge, Malbrough was identified as part of the leadership of the criminal street gang,

[3] We have redacted a portion of the cell phone numbers.

Records showed calls from appellant to the number associated with the store where Ali Riaz worked.[4] Those calls corresponded with some of the dates of the robberies.

Deputy Victor Vagliente of the Harris County Sheriff's Office accompanied Katrib as part of a warrant execution team. Katrib executed an arrest warrant for Malbrough, while Vagliente executed a search warrant by entering Malbrough's apartment. Vagliente recovered guns, black gloves, and ski masks from the apartment.

Katrib conceded that appellant never entered the stores. Appellant is not seen in any of the surveillance video from the robbed stores and there is no DNA or fingerprint evidence tying appellant to the stores or the vehicles. During his interview with Katrib, appellant denied knowing the individuals who committed the robberies.

Katrib also provided information to James Taylor, of the Communications Intelligence Unit of Houston Police Department, about which phone numbers corresponded to the various suspects. Taylor prepared a report based upon the phone records and testified at trial to his findings. We summarize Taylor's findings, as related to the issues in this case, below.

H.    Evidence of Telephone Communication

On March 18, 2015, there was a call from Mitchner to Malbrough, close in time to when the robbery was reported to the police. The call was made in the direct area of the robbery.

---

[4] As noted below, Riaz was charged with felony theft, specifically theft by receiving stolen property, for purchasing the stolen cellphones.

On April 3, 2015, Malbrough called Williams at 12:54 p.m., thirty to forty minutes before the robbery. The call was prefaced by star 67 to block the number from being displayed on Williams' cellphone. Within three minutes of the robbery being reported to police, Hill called appellant from a location close to the robbery scene. Additional calls were made at approximately 1:13 p.m., 1:16 p.m., 1:27 p.m., and 1:50 p.m. that day. Three calls between Malbrough and Williams were made immediately before and after the robbery. Almost immediately after the robbery, calls were made between appellant and Riaz. From 4:52 p.m. to 4:58 p.m. that day, there were repeated calls between appellant's phone and Malbrough's phone through the cell tower adjacent to Riaz's store.

On April 15, 2015, there was a phone call from appellant to Williams at 6:35 p.m., just prior to the robbery. Calls were made immediately following the robbery. There was a call between appellant and Riaz at 6:57 p.m. Several hours after the robbery, there were seven calls between appellant and Malbrough. Those calls went through cell towers located in the area near the robbery. There were also text messages from Randall to appellant and Malbrough that day.

On May 4, 2015, there were text messages to appellant from Randall and between Randall and Malbrough.

The day before the robbery on May 21, 2015, there were text messages from Malbrough to Randall. On the day of the robbery, approximately twenty minutes before it was reported, there was a call between Malbrough and Randall. The calls went through a cell tower in the area near the store being robbed.

Taylor testified the only communications between the group of analyzed records and Riaz were with appellant's phone. Although Taylor received records for a large number of different handsets associated with appellant's phone, the records

14

did not show that anyone other than appellant ever contacted the number associated with Riaz.

Taylor analyzed the communications and mapped the locations of the phones on the dates and at the times when the robberies occurred. The phones associated with appellant and Malbrough were in an area consistent with being at or near the scene of multiple incidents at the times of the respective episodes. The phones associated with appellant and Malbrough communicated with individuals who committed the respective crimes during the time of the crimes.

Taylor admitted that cell tower records cannot tell precisely where a cellphone is at any time or who is holding the phone. Further, Taylor testified most of the calls involved Malbrough.

I.     Accomplices

The trial court found, and instructed the jury in the charge, that the following witnesses were accomplices as a matter of law: Jaimi Hawkins, Antoine Duplechin-Holden, Anthony Hill, Deondrick Mitchner, and Denarwin McCoy. As appellant acknowledges in his appellate brief, Ali Riaz was not included in the accomplice-witness instruction. Appellant makes no complaint that the charge was erroneous, but he asserts Riaz was also an accomplice, because at the time of trial he was charged with felony theft, specifically theft by receiving stolen property, for purchasing the stolen cellphones. In support, appellant cites *Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998), for the holding that an accomplice is a person who could be prosecuted for the same offense, or a lesser-included offense, as the defendant.

In addition to being charged with directing activities of a criminal street gang, appellant was charged with the lesser-included offenses of aggravated robbery and

15

felony theft. In *Ash v. State*, 533 S.W.3d 878, 886 (Tex. Crim. App. 2017), the court clarified that "a witness is an accomplice as a matter of law . . . [i]f the witness has been charged with the same offense as the defendant or a lesser-included offense." Because Riaz was charged with a lesser-included offense of the offense with which appellant was charged, Riaz's testimony is subject to the accomplice-witness rule. Accordingly, we also separate it from the above evidence. *See Ash*, 533 S.W.3d at 886; *see also Blake*, 971 S.W.2d at 454.

1.     Ali Riaz

Riaz recognized appellant and identified him. Riaz's initial encounters with appellant occurred when appellant came to the store where Riaz worked to pay for monthly prepaid contracts. Riaz did not recall whether appellant bought a phone from him. About eight or nine months after appellant began coming to the store, appellant started selling phones to Riaz, one to two at a time, for $20 to $25 per phone. Appellant gradually brought in more phones, up to four or five at a time, every week or every few weeks. This occurred about ten to fifteen times. Riaz could not recall in what month those transactions occurred. In their last transaction in April 2015, appellant brought in thirty to thirty-five phones at one time.

Riaz testified that he checked the IMEI (International Mobile Equipment Identity) number of each phone — a 15-digit code unique to the phone — while appellant was in the store and none of the phones were blacklisted. Appellant frequently called Riaz seeking an offer but if they could not agree on price, appellant did not come into the store and the sale did not take place. The number of sales that did not occur was substantially more than the number that did. Riaz estimated they did not come to an agreement sixty to seventy times. When questioned about a prior

statement where Riaz said it was twice, Riaz said he must have misunderstood the question.

Riaz testified that he would verify the phone was not stolen based upon its IMEI number and, after a price was negotiated, pay appellant cash for the phone. Riaz testified that stolen phones were "blacklisted" by the carrier and had no value. Riaz was instructed by the store's owner, Furquan Narejo, to run the IMEI numbers each time to ensure the phones were not stolen. Riaz testified that every time appellant brought him a phone, he ran the IMEI number and none was reported stolen.

According to Riaz, the phones were kept in the store after they were purchased from appellant. They were then sold to a man named Attif and the sales were conducted at Attif's house. The profit gained from selling the phones purchased from appellant went to Narejo. The phones were in the box, but not in shrink wrap, which would have indicated the phone had been activated. Appellant told Riaz that from the money received from the sales he had to pay other people, but he did not say who they were. Riaz paid about $150 below market price for the phones. The cash to buy the phones came from Narejo.

Riaz testified that on the occasion when appellant brought in thirty or more phones to sell, Riaz paid him $12,000 to $13,000 cash from Narejo, plus $4,000 to $5,000 from the store. Riaz testified that was not a normal transaction. According to Riaz, he ran all the IMEI numbers and Narejo told him to buy all the phones.

Riaz's store was burglarized in July 2015, at a time when it was closed. Phones and accessories were stolen. Katrib showed Riaz photographs of suspects and asked if he recognized anyone. Katrib did not ask Riaz to identify anyone involved in the robbery. Riaz circled appellant's picture. Riaz confirmed that the person he identified was appellant. Riaz did not believe that appellant was only selling phones

17

to him. Riaz testified that he did not think the phones he purchased from appellant were stolen.

Riaz paid between $475 to $500 for the phones with smaller gigabytes. That amount would increase $100 for phones with more gigabytes. Riaz estimated that before the large sale, he cumulatively had paid appellant about $25,000 for the smaller sales. Riaz always paid appellant in cash, brought to appellant by Narejo, who authorized the purchases, or from the cash register. Riaz estimated that appellant was paid $40,000 to $45,000 for all the transactions between them.

2.    Anthony Hill

Hill participated in the March 18 and April 3 robberies. He identified appellant in the court room. Hill had known appellant for approximately four years. Hill described appellant as a friend and said he thought of him as a big brother. Hill said their relationship was important to him.

On March 18, 2015, Hill received a call from Sullivan, a friend from school, asking Hill to come to his house. When Hill arrived, several individuals were at the house, including appellant. Appellant told Hill to follow him. Hill was the driver for Williams and Mitchner, and the three of them were in a 2005 Nissan Altima. Hill testified the target for the robbery was chosen by Malbrough and appellant. Appellant was communicating with Hill by speakerphone, and Hill was able to hear both appellant and Malbrough. Williams had a pistol, and his role was to hold the gun and take the money. Mitchner's role was to hold the bag and make sure all the phones were placed inside. While they were driving to the target location, appellant told Williams and Mitchner to go in the store, get all the phones, and run.

Appellant and Malbrough were acting as lookouts from across the street. Over the phone, appellant described what was happening during the robbery to Hill, who

could not see inside the store. When Williams and Mitchner came out, Hill was ready because appellant had told him they were coming. Williams and Mitchner exited the store with two sacks of phones and got in Hill's car. Hill drove to a set of apartments where the phones were transferred to Malbrough's car. The phones were to be sold by Malbrough and appellant. Appellant would not identify the buyer. Later that day at Sullivan's house, appellant paid Hill $750. Appellant also paid Williams, Mitchner, Sullivan, Marcus Rogers, McCoy, and Torrey Smith, but Hill did not know the amounts. Hill did not know why those who did not directly participate in the robbery were paid. Appellant had a large sum of money after selling the phones and paid cash. According to Hill, appellant and Malbrough were in control and made the decisions — they chose the robbery targets, who would participate in the robberies, and what role each person played.

On April 3, 2015, Hill received another call from Sullivan to be the driver in another robbery. Williams, Criswell and Randall were to enter a Radio Shack chosen by Malbrough. They were in a car driven by Hill, who was followed by Malbrough and appellant in another vehicle. Hill was able to communicate with Malbrough and appellant by speakerphone, but he did not receive any instructions because Williams, Criswell, and Randall already knew what to do. Williams, Criswell and Randall went into the store. Williams and Randall were armed. Hill was not on the phone with appellant or Malbrough during the robbery, but testified appellant and Malbrough were in the area acting as lookouts. Appellant and Malbrough assigned specific jobs to Williams, Criswell, and Randall and issued instructions during the robbery to the men in the store. Both appellant and Malbrough were in charge; they provided the leadership and made the decisions.

Williams, Criswell, and Randall returned to Hill's vehicle with the stolen phones. They proceeded to Malbrough's house to count the phones. Hill was only

19

paid $300 because the phones were worth less than those stolen on March 18. Appellant paid everyone after the robbery. Malbrough and appellant were the only ones that handled the money. Hill told appellant several weeks later that he did not want to be the driver for any more robberies.

On cross-examination, Hill altered his testimony. Specifically, Hill testified that for the March 18 robbery, it was Sullivan, and not appellant, that told Hill they wanted him as the driver. Hill said Malbrough picked the store and told him to follow, and Malbrough was driving the car. During the drive, appellant did not tell Hill where to go, and they were not on the phone at the time. Appellant did not tell Williams and Mitchner what to do; they knew what to do. When Hill pulled up to park, he could see Malbrough's car and it was too far away for Malbrough and appellant to be able to see what was happening in the store. When Hill was paid at Sullivan's house, it was Sullivan who handed him the money. Hill agreed that "[t]his was a loose group of guys getting together" to commit aggravated robbery.

Regarding the April 3 robbery, Hill testified that he could not see Malbrough's car when he parked at the Radio Shack. Appellant and Malbrough never said they would be lookouts. It was Malbrough who handed Hill the money after the robbery. Hill agreed that Katrib told him that Malbrough and appellant were lookouts and claimed that he was under the influence of marijuana, promethazine, and Xanax when he was arrested and first talked to Katrib. Hill said he was intimidated by Katrib. Hill admitted there were mistakes in his statements to the officer and in his testimony. Hill testified that no one was ordered or told what to do because they already knew.

On redirect, Hill admitted that he regretted accepting the plea bargain. Hill said appellant is not a bad person and helps others when they need it. Hill did not

20

want to see appellant in trouble and admitted that he was trying to prevent appellant from being convicted.

3.    Deondrick Mitchner

Mitchner participated in the March 18 and April 26 robberies. He identified appellant in court, whom he first met on March 18, 2015. Mitchner was introduced to appellant by his brother, Williams. Mitchner had met Malbrough about a year earlier. Appellant gave Mitchner the "rundown," and he and Williams agreed to do the robbery. Appellant told Mitchner to get in and out as quickly as possible. Mitchner said he believed appellant had chosen the location. However, Mitchner also testified that both appellant and Malbrough gave him "the rundown" and Malbrough was saying it "the most" while appellant agreed with Malbrough. Mitchner also admitted he did not know who chose the location.

Hill drove Mitchner and Williams to the cellphone store. When Mitchner entered the car, the weapons were already inside. While they were in the car, Hill was on the phone with someone that Mitchner believed was appellant. Appellant was in a separate car with Malbrough, but Mitchner did not see their car in the parking lot outside the store. Malbrough and appellant told Mitchner they were going to drive around and scope out the area.

Before Mitchner entered the store, appellant called and asked Mitchner if he was ready. Appellant had told Mitchner not to get any tracker phones. Mitchner carried a weapon during the robbery and Williams carried the bag. After the robbery, they ran out the front door and around the store to the back where Hill was waiting. The men then went to a location selected by appellant to transfer the phones to him. Mitchner thought the phones were turned over to appellant. Appellant sold the stolen phones and paid Mitchner and Williams. Mitchner was paid $1,500. Mitchner was in a car with appellant and Malbrough when he was paid. Mitchner did not see

21

appellant pay Williams but believed Williams had been paid. Mitchner testified Malbrough handed Mitchner the cash in the car, but also stated he did not remember if it was appellant who paid him.

At trial, Mitchner identified Williams in the surveillance video from the store robbery on April 15, 2015.

Mitchner and Williams also participated in the April 26 robbery, along with Hawkins. Rogers chose the store and he picked up Mitchner. They switched to a gold car driven by Philpot. Mitchner, Williams, and Hawkins went into the store. Mitchner and Williams were armed but Hawkins was not; her job was to get the phones. The weapons were in the car when Mitchner entered it. They left the store with stolen cellphones.

As they were driving down the freeway, a police vehicle pulled up behind them. After they stopped, Mitchner, Williams, and Hawkins ran into some woods. They came to a residential area and about fifteen minutes later, police cars arrived. Mitchner was arrested. According to Mitchner, the plan was to sell the phones. Mitchner "guessed" the driver was supposed to sell them.[5]

After his arrest, Mitchner was taken to the police station and met with Katrib. Mitchner referred to appellant and Malbrough as Batman and Robin when asked about their relationship. Mitchner had his cellphone when arrested. Mitchner identified his e-mail address and cellphone number. Mitchner believed Malbrough's number was saved on his phone and that he exchanged text messages with Malbrough.

---

[5] It is unclear whether "the driver" refers to Rogers or Philpot.

4.    Jaimi Brandi Hawkins

Hawkins participated in the aggravated robbery on April 26, 2015. Rogers picked Hawkins up "to go rob a store." Williams and Mitchner were with Rogers and both had firearms in their pockets. They all wore hoods and had masks to cover their faces. Philpot drove Hawkins, Williams, and Mitchner to the store in a Pontiac Torrent. Philpot had the idea to call the store to ensure they had iPhones.

Williams entered the store first, followed by Mitchner and Hawkins. Hawkins went straight to the back of the store and placed about forty phones from the safe, which was already open, into a duffel bag. Hawkins did not see Williams or Mitchner threaten the clerk with a gun to open the safe.

After the robbery, Hawkins got into the car with Rogers. After driving about a mile, they switched to Philpot's car. They were chased and stopped by police and they all got out and ran. Hawkins ran into the woods and later went home. She was arrested a week later. Hawkins identified items found in the Pontiac driven by Philpot as the phones taken from the store and the firearms carried by Williams and Mitchner. Hawkins did not know appellant and had only seen him once before. She did not recognize him in the courtroom.

5.    Denarwin James McCoy

McCoy testified that he participated in the April 27, 2015, robbery. McCoy identified himself on the video surveillance admitted into evidence.

6. Antoine Duplechin-Holden

Antoine participated in the robbery on May 21, 2015, along with Randall and Criswell. According to Antoine, Randall was committing aggravated robberies that were orchestrated by appellant and Malbrough. Antoine identified appellant in court.

Randall introduced Antoine to appellant and Malbrough. Appellant and Malbrough were already watching the intended target, a Sprint store. Antoine and Randall talked to appellant and Malbrough three to four times about committing an aggravated robbery. At the third meeting, they prepared for the aggravated robbery. Appellant told Antoine the plan for the robbery. The first step would be to obtain a stolen car. Appellant said there would be two people in the stolen car and one person in the getaway car. Two people would enter the store and get the phones and money. Those three would leave in the stolen car, drive to the getaway car, and take the getaway car to an assigned destination. Appellant said he and Malbrough would be watching from afar. It was no more than ten days from that meeting until the robbery.

On the day of the robbery, Randall picked Antoine up at Antoine's house. Randall, Criswell, and Antoine went to the east side and waited for the stolen car, a Dodge Durango. Antoine could tell it was stolen because there was a screwdriver in the ignition. Randall was the driver, and Criswell and Antoine were to enter the store. The Durango broke down on the freeway and was abandoned. They then took Antoine's car, a 2001 Grand Marquis, after replacing the license plates with paper tags from another car and drove to the Sprint store.

Appellant provided the firearms a few days earlier. They had followed appellant to a two-story home where he retrieved a black backpack with two guns — a .45 Kimber with a 30-round clip and a .357 Magnum.

24

Malbrough and appellant were in Malbrough's gold Mercedes Benz. Appellant and Malbrough were already watching the store and told the others to stand by. During the robbery, Antoine was able to see Malbrough's parked vehicle in the first parking space in front of a Chili's restaurant. Antoine, Randall, and Criswell were parked in front of another store. Appellant and Malbrough called Randall's phone — Antoine could hear both their voices on speakerphone — and they were told to get ready because a lady was going to leave and there were two workers in the store. Antoine predominantly heard appellant's voice. They were told the woman had left and appellant said, "Y'all get ready. It's — y'all can start now."

Randall pulled up between Chili's and the Sprint store, and Criswell and Antoine exited the vehicle at the front door. Randall told Antoine who would go in, who was going to hold the bag or the gun, and how to empty the safe. Antoine did not know who showed Randall how to rob the store. Antoine had the phone in his pocket on speakerphone the whole time and was able to hear instructions and communicate with Randall.

Criswell and Antoine entered the store. Criswell had the weapon and Antoine had the bag. Criswell told the people in the store to go to the back. There were three males inside, two of whom were employees, and they were told to get down. One employee opened the vault with the phones and placed them in a bag as fast as he could. Antoine did not have a gun in the store, only a bag. Antoine did not steal money from anyone's pocket but believed Criswell did. Antoine and Criswell took phones and iPads, grabbed the money from the register, and left.

Antoine saw the faces of appellant and Malbrough in Malbrough's car when he exited the store. After they drove away, they did not see Malbrough's car again. Randall was ready because he knew when to pick them up from the store. Before the robbery, Antoine heard over the speakerphone that they were to return to the east-

side condos with the stolen property. Antoine and Criswell were in the back seat checking for a tracker phone. Randall proceeded north. Antoine saw a squad car driving too fast and doing too much maneuvering, and he alerted Randall. Randall sped up and so did the squad car, lights activated. More than one squad car was following them. Criswell "threw the gun outside — shot the window." The magazine for that gun also was thrown out. Antoine did not know what happened to the other gun. During the pursuit, appellant and Malbrough called Randall after Randall called them.

Eventually, Randall turned into a cul-de-sac. Criswell and Randall ran from the car, but Antoine could not exit the car. A police officer was there immediately and arrested Antoine. Police searched for Criswell and Randall for approximately two or three hours until apprehending them. Antoine saw Randall but did not see Criswell until they got to Harris County. Antoine's phone was taken when he was arrested. He did not have appellant's or Malbrough's number in his phone, but he had Randall's number.

Antoine expected to be paid "probably about more than $3,000," but no amount was ever actually agreed upon. Antoine was never paid because he got caught.

Appellant never went into the Sprint store and Antoine did not know if appellant had a gun in his possession. No one made Antoine do anything, but, according to Antoine, appellant and Malbrough were the leaders and they were orchestrating and organizing the crimes. Appellant and Malbrough were the ones "[w]atching the store to commit the crime." Appellant never called Antoine's phone. No one had to tell Antoine that appellant was the leader.

*Standard of Review and Applicable Law*

When reviewing the sufficiency of the evidence, we view all the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences from it, whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011); *see also Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The jury is the exclusive judge of the credibility of the witnesses and the weight to be given to the evidence. *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Further, we defer to the jury's responsibility to fairly resolve conflicts in testimony, weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id*. This standard applies to both circumstantial and direct evidence. *Id*. We do not engage in a second evaluation of the weight and credibility of the evidence, but only ensure the jury reached a rational decision. *Muniz v. State*, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993).

Although the charge did not include Riaz in the accomplice-witness instruction, we measure the sufficiency of the evidence as defined by the hypothetically correct jury charge. *McCombs v. State*, 562 S.W.3d 748, 759 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). A hypothetically correct jury charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden or restrict the State's theories of liability, and adequately describes the offense for which the defendant is on trial. *Id*. Our use of the hypothetically correct jury charge ensures a judgment of acquittal is reserved for cases in which there is an actual failure in the State's proof of the crime, rather than a mere error in the jury charge. *Id*.

*Analysis*

As applicable to the facts of this case, a person commits the offense of directing activities of a criminal street gang "if the person, as part of the identifiable leadership of a criminal street gang, knowingly finances, directs, or supervises, the commission of, or a conspiracy to commit . . . by members of a criminal street gang . . . a felony offense that is listed in Article 42A.054(a), Code of Criminal Procedure . . . ." Tex. Penal Code § 71.023(a)(2). The felony offense at issue in this case is aggravated robbery. *See* Tex. Code Crim. Proc. art. 42A.054(a)(10). A criminal street gang is defined as three or more persons who have a common identifying sign or symbol, or an identifiable leadership, who continuously or regularly associate in the commission of criminal activities. Tex. Penal Code § 71.01(d). Specifically, appellant contends the jury could not have found that he (1) was part of the "identifiable leadership" of a "criminal street gang;" (2) the aggravated robberies were committed by a "criminal street gang;" or (3) that he knowingly financed, directed, or supervised the commission of the aggravated robberies.

As the evidence set forth above demonstrates, the *modus operandi* of the six robberies of the cellphone stores reflects a common scheme or plan. Although the robberies were not all committed by the same individuals, there was significant overlap: Williams was involved in four robberies; Hill was involved in two robberies; Mitchner was involved in two robberies; Criswell was involved in two robberies; Randall was involved in two robberies; and Sullivan was involved in three robberies. The jury heard testimony that appellant was one of two leaders who directed and/or supervised the six robberies. Specifically, there was testimony that appellant chose locations, assigned tasks to specific individuals, provided weapons, and even had Hill follow him to the target store on March 18, 2015. Antoine's testimony as to appellant's involvement in the robbery on May 21, 2015, is

28

corroborated by the video evidence showing a gold Mercedes Benz following the getaway car after the robbery. From this body of evidence, a rational trier of fact could find there were three or more persons, with an identifiable leadership, who regularly associated to commit criminal activities. Consequently, a rational fact-finder could find the aggravated robberies were committed by a criminal street gang. *See* Tex. Penal Code § 71.01(d).

Further, the jury heard evidence that appellant chose at least one of the stores to rob; he provided weapons for at least two of the robberies; he acted as a look-out for three robberies; he communicated on three occasions with one or more of the participants during the robbery or a flight therefrom; he was paid by Riaz in cash for phones ten to fifteen times; and he paid participants of at least two robberies in cash. Accordingly, a rational trier of fact could find appellant knowingly financed, directed, and/or supervised the cellphone store robberies.

Considering all the evidence in a light most favorable to the verdict, we conclude a rational juror could have found appellant guilty beyond a reasonable doubt of directing activities of a criminal street gang. *See Jackson,* 443 U.S. at 319; *Gear,* 340 S.W.3d at 746. Appellant's first issue is overruled.

## ACCOMPLICE-WITNESS TESTIMONY

In appellant's third issue he asserts the testimony of the accomplice-witnesses was not sufficiently corroborated. Article 38.14 of the Code of Criminal Procedure, entitled "Testimony of Accomplice," requires that before a conviction may rest upon the testimony of an accomplice witness, it must be corroborated by independent evidence tending to connect the accused with the crime. Tex. Code Crim. Proc. art 38.14; *Simmons v. State*, 282 S.W.3d 504, 505 (Tex. Crim. App. 2009). The law does not impose legal-sufficiency standards upon a review of accomplice witness testimony under Article 38.14. *Cathey v. State*, 992 S.W.2d 460, 462–63 (Tex. Crim.

App. 1999). The accomplice-witness rule is a statutorily-imposed sufficiency review that is not derived from federal or state constitutional principles defining legal sufficiency standards. *Id.* "The burden established by the Legislature is that there be other evidence tending to connect the defendant with the offense." *Id.*

To satisfy the accomplice-witness rule's requirements, the corroborating evidence does not need to be sufficient in itself to establish guilt. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). Nor is it necessary for the non-accomplice evidence to directly link the accused to the commission of the offense. *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994). The evidence must simply link the accused in some way to the commission of the crime and show that rational jurors could conclude the evidence tended to connect the accused to the offense. *Simmons,* 282 S.W.3d at 508. Each case must be decided on its own facts and circumstances. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011); *Gill*, 873 S.W.2d at 48. All facts, both direct and circumstantial, may be examined in ascertaining whether sufficient corroboration exists. *Gosch v. State*, 829 S.W.2d 775, 777 (Tex. Crim. App. 1991).

Therefore, in our review we eliminate all accomplice-witness testimony from consideration and then determine whether the remaining non-accomplice-witness testimony and evidence tends to connect the accused with the commission of the crime. *Malone*, 253 S.W.3d at 257; *Yost v. State*, 222 S.W.3d 865, 872 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd). When there are two views of the evidence—one tending to connect the accused to the offense and the other not—we defer to the fact-finder's view of the evidence. *Smith*, 332 S.W.3d at 442.

As set forth above, most of the evidence against appellant was the testimony of the accomplices. For his conviction to stand, there must be some other evidence tending to connect him to the aggravated robberies. The cellphone records and

Officer Taylor's testimony based on those records provides the requisite corroborative evidence.

Taylor testified that on April 3, 2015, Hill called appellant at 1:35 p.m. from a location close to the robbery scene. The call was made within approximately three minutes of the robbery being reported to police. From 1:43 p.m. to 3:15 p.m., calls were made between appellant and Riaz. Around 5:00 p.m., calls were made between appellant and Malbrough that went through the cell tower adjacent to Riaz's store.

Taylor further testified that on April 15, 2015, there was a phone call of approximately 13 minutes from appellant to Williams at 6:35 p.m., just before the robbery. Immediately after the robbery, at 6:57 p.m., a fifteen-second call between appellant and Riaz occurred. Seven calls were made between appellant and Malbrough between 8:04 p.m. and 8:35 p.m. that evening.

The records and testimony regarding calls made on April 3, 2015, and April 15, 2015, are circumstantial evidence that tend to connect appellant to the aggravated robberies. *See Nolley v. State*, 5 S.W.3d 850, 853 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (stating corroborative evidence may be circumstantial and it need not directly link the defendant to the crime as long as it tends to link him to the crime). A direct link is not required. *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996). As this court recognized in *Longoria v. State*, 154 S.W.3d 747, 758 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd), evidence of communications between a defendant and perpetrators during the course of a robbery and immediately afterward constitute strong circumstantial evidence that tend to connect the defendant to the crime. *Cf. Cerna v. State*, 441 S.W.3d 860, 866 (Tex. App.— Houston [14th Dist.] 2014, pet. ref'd) (among other things, the fact that defendant exchanged text messages with accomplice just before murder corroborated testimony of accomplice). The evidence that appellant was in the area of more than

one robbery at the time of those robberies, coupled with the evidence that appellant, and only appellant, contacted Riaz on the phone after several robberies, tends to connect appellant to the robberies. *See Dowthitt*, 931 S.W.2d at 249 (noting that "mere presence" is insufficient by itself to corroborate accomplice testimony but when coupled with other suspicious circumstances may tend to connect the accused to the offense).

Because the non-accomplice evidence links appellant "in some way" to the aggravated robberies, a rational juror could conclude the evidence tended to connect him to the offenses. *See Simmons,* 282 S.W.3d at 508. Accordingly, we overrule appellant's third issue.

## CHARGE ERROR

### *Punishment Phase*

In appellant's first issue he claims the trial court erred in instructing the jury in the punishment-phase charge that it could assess a fine in any amount not to exceed $10,000. The statute under which appellant was convicted does not provide for the imposition of a fine. *See* Tex. Penal Code § 71.023(b). Accordingly, we agree the trial court erred in giving the instruction and note the State does not argue otherwise.

However, since no objection was made to the charge, the error is reversible only if it resulted in egregious harm. *Bluitt v. State*, 137 S.W.3d 51, 52–53 (Tex. Crim. App. 2004); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985); *Lopez v. State*, 515 S.W.3d 547, 551 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). We conclude the error was harmless.

The State did not request a fine as part of appellant's punishment and, in fact, the State asked the jury to ignore that option. More importantly, no fine was assessed.

The punishment assessed by the jury, confinement for fifty-five years, is within the lawful range of punishment for the offense charged. *See* Tex. Penal Code § 71.023(b) ("An offense under this section is a felony of the first degree punishable by imprisonment in the Texas Department of Criminal Justice for life or for any term of not more than 99 years or less than 25 years."). Because the record does not reflect that the error in the charge resulted in harm to appellant, issue one is overruled.

*Guilt-Innocence Phase*

In his second issue, appellant contends the trial court erred in instructing the jury as to the law of parties as related to the offense of directing activities of criminal street gangs. The charge to the jury as to guilt or innocence provided:

> All persons are parties to an offense who are guilty of acting together in the commission of the offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.
>
> A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to an offense.
>
> . . .
>
> If you find from the evidence beyond a reasonable doubt that in Harris County, Texas, Quinton Malbrough, heretofore on or about the 30th day of June, 2014 and continuing through June 18, 2015, did then and there unlawfully, as part of the identifiable leadership of a criminal street gang, knowingly finance, direct, or supervise the commission of the offense of aggravated robbery by members of said criminal street gang, and that the defendant, Terrence Devaughn Edwards, with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid Quinton Malbrough to commit the offense, if he did, then you will find the defendant guilty of directing the activities of a certain criminal street gang, as charged in the indictment.

33

Appellant argues the law of the parties should not apply to this offense. Assuming, without deciding, it was error to submit a party instruction, Appellant did not object and we may not reverse his conviction unless we find egregious harm. *See Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008) (citing *Almanza*, 686 S.W.2d at 157). In addition to authorizing conviction as a party, the charge authorized appellant's conviction as a principal. "Where the evidence clearly supports a defendant's guilt as a principal actor, any error of the trial court in charging on the law of parties is harmless." *Black v. State*, 723 S.W.2d 674, 675 (Tex. Crim. App. 1986); *accord Ladd v. State*, 3 S.W.3d 547, 564–65 (Tex. Crim. App. 1999). As set forth above, the evidence clearly supports appellant's conviction as a principal. Accordingly, we conclude the record does not reflect appellant suffered egregious harm from any error in charging the jury on the law of the parties. *See Molina v. State*, 450 S.W.3d 540, 549 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *Washington v. State*, 417 S.W.3d 713, 723–24 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). Issue two is overruled.

## DEADLY -WEAPON FINDING

In appellant's fourth issue he asserts the judgment should not include an affirmative deadly-weapon finding. The record reflects defense counsel asked the trial court not to enter a deadly-weapon finding in the judgment and the trial court refused, as follows:

> [Defense Counsel]: Since the State abandoned the deadly weapon language in the indictment, I would ask that the Court not enter a deadly weapon finding in the judgment.
>
> [The State]: Your Honor, we would request a deadly weapon finding. One of the elements of aggravated robbery, which is included in the indictment even after the surplusage was abandoned, a deadly weapon was used or displayed.
>
> THE COURT: The Court's in recess

34

. . .

[Defense Counsel]: Judge, I had a request earlier and I make a request again that this Honorable Court not enter a deadly weapon finding in the judgment and sentence because the State abandoned the deadly weapon language in the indictment before the jury deliberated on the case.

[The State]: And I would request the Court make a finding that a deadly weapon was used or displayed. Deadly weapon is included in the allegation of aggravated robbery in the indictment, and it's supported by the evidence in the case.

THE COURT: But did the State abandon that language in the indictment prior to trial?

[The State]: Judge, we abandoned those alternative manners and means as surplusage during the course of the trial prior to submitting the charge to the jury; but that's – it's – the deadly weapon language is not only included in those two options, it's also included in the aggravated robbery allegation, the manner and means, which the State retained in the indictment.

THE COURT: Okay. Anything further from the State?

[The State]: No, Your Honor.

THE COURT: Anything further from Defense?

[Defense Counsel]: No, Your Honor.

THE COURT: Defense counsel, your motion is denied.

There are three ways we can determine that the trier of fact made an affirmative finding of a deadly weapon:

(1) the indictment specifically alleged a "deadly weapon" was used (using the words "deadly weapon") and the defendant was found guilty "as charged in the indictment;"

(2) the indictment did not use the words "deadly weapon" but alleged use of a deadly weapon per se (such as a firearm); or

(3) the jury made an express finding of fact of use of a deadly weapon in response to submission of a special issue during the punishment stage of trial.

35

*Duran v. State*, 492 S.W.3d 741, 746 (Tex. Crim. App. 2016).

The indictment contained in the record before this court alleged that appellant "did then and there unlawfully, as part of the identifiable leadership of a criminal street gang, knowingly FINANCE, DIRECT, AND SUPERVISE THE COMMISSION OF the OFFENSES of AGGRAVATED ROBBERY BY MEMBERS OF SAID CRIMINAL STREET GANG." Thus, the indictment did not use the words "deadly weapon" or allege the use of a deadly weapon per se. Further, a special issue on the use of a deadly weapon was not decided by the jury.

There was no affirmative finding by the trier of fact on the use of a deadly weapon. *See Polk v. State*, 693 S.W.2d 391, 396 (Tex. Crim. App. 1985). We sustain appellant's fourth issue and modify the judgment to delete the deadly-weapon finding.

## CONCLUSION

As modified, the judgment of the trial court is affirmed.


/s/    Margaret "Meg" Poissant
Justice


Panel consists of Chief Justice Frost and Justices Spain and Poissant.
Do Not Publish — Tex. R. App. P. 47.2(b).